IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Case No. 19-47030-705 |
| HH ST. LOUIS RAILWAY, LP, | ) Charles E. Rendlen III |
| | ) Chapter 7 |
| Debtor. | ) |
| | ) |

**SUGGESTIONS IN SUPPORT OF MOTION TO ABSTAIN AND DISMISS**

COMES NOW HH St. Louis Railway LP ("HH Railway"), by its counsel, and for its Suggestions in Support of Motion to Abstain and Dismiss states to the Court as follows:

**INTRODUCTION**

Three purported creditors of HH Railway[1], asserting a fractional amount owed, filed an involuntary bankruptcy petition seeking a chapter 7 trustee with regard to an entity owning a massive vacant downtown office building.[2]  As will be explained herein, HH Railway's operations, tasks, financial requirements, and time consuming and sensitive circumstances are ill-suited for the appointment of a chapter 7 trustee, one that would necessarily have to be an operating trustee.  The case is also ill-suited for any other proceeding or chapter under the Bankruptcy Code.  It is a case where market forces and state court remedies are needed and mandated, making this case suitable for abstention and dismissal under section 305 of the Bankruptcy Code, or, alternatively, under section 707(a) of the Bankruptcy Code.

HH Railway is the owner of a landmark and iconic building in downtown St. Louis, the Railway Exchange Building, and the accompanying adjacent garage. The Railway Exchange Building is vacant and in need of comprehensive renovation, but HH Railway has no or minimal

---

[1] After the initial filing of the involuntary petition, a fourth creditor with a small claim, thereafter also joined in the filing.
[2] The filing of the Motion to Abstain and Dismiss does not concede that the petitioning creditors have noncontingent and undisputed claims.  The claims of the petitioning creditors will be addressed at the appropriate time.   In the meantime, the issue of abstention and dismissal is ripe for adjudication, which should resolve any potential issue of contingent and disputed claims.

revenues at present to rectify this problem. In their present configuration, the buildings are subject to substantial secured debts, the primary one to Gamma Real Estate Capital, LLC ("Gamma"), having a claim in excess of $18,600,000, and multiple claims for mechanics' liens in the millions of dollars, many of which are vying for priority senior to the secured debt of Gamma. The only salvation for this project is the utilization of the many millions of dollars of federal and state tax credit needed to leverage capital, investment and other funding of approximately more than $300,000,000. This is not a project that the Bankruptcy Courts or any chapter 7 trustee can fix. In fact, HH Railway respectfully submits a trustee would only make this situation more difficult to succeed. The unsecured creditors of HH Railway, which include the undersecured claims of the secured creditors, are not in the money today, and are attempting to use the bankruptcy as a collection device. If there is any hope for these unsecured creditors, it is through the sorting out of the priorities of the secured claimants and/or the use of tax credits and market forces outside of bankruptcy that will make or break this project. Consequently, for the reasons set forth herein, abstention and/or dismissal is clearly in the best interests of HH Railway and its creditors.

## FACTS

In or about January of 2017, HH Railway acquired the Railway Exchange Building, a vacant building that has approximately 1,200,000 square feet of space, as part of a very complex series of transactions whereby Gamma provided the purchase money financing. As part of this transaction, HH Railway secured substantial federal and state tax credits. The note and loan obligations to Gamma are secured by a comprehensive lien on all or substantially all assets of HH Railway, including a Deed of Trust, Assignment of Rents, a pledge of partnership interests and other related loan documents.

The tax credits and subsidies obtained in connection with this project include the following: 1) Missouri Historic Tax Credits ("MHTCs") in excess of $50,000,000 (RSMo section 253.550); 2) Federal Historic Tax Credits ("FHTCs") that permit twenty percent (20%) of "qualified rehabilitation expenses" ("QREs") to be monetized with a value likely in excess of $50,000,000 to HH Railway (26 USC section 47); 3) $50,000,000 in 2017 tax exempt bonds; and 4) a pending Low Income Housing Tax Credit application worth in excess of $8,000,000 (26 USC section 42).[3] The tax credits and subsidies are instrumental as part of HH Railway's overall plan to develop the project. However, as set forth below, many of these tax credit programs would be placed in jeopardy if an order for relief under the Bankruptcy Code is granted.

HH Railway performed the initial site work, including such items as architectural plans, environmental assessments and other preliminary work that goes into a project of this magnitude. During the course of this work, HH Railway contracted with various contractors that commenced performance of a variety of services. Many of these contractors asserted mechanics' liens when the funding for the pre-development costs slowed. Likewise, there was a substantial water main break that occurred in or about November of 2016, with a second rupture in June of 2017 that collectively caused substantial damage to the premises, resulting in the need for remediation. At the present time, there is pending lien litigation in the Circuit Court of St. Louis City, styled and consolidated under Cannon Design, Inc. v. HH St. Louis Railway, LP, et. al., Case No. 1922-CC00312, involving many of the contractors, whose claims consist, in part, of the following:

| Contractor | Lien Claim[4] |
|---|---|
| B&P Construction, Inc. (including subcontractors) | $903,605.45 |

---

[3] In addition to the tax credits, there are TIF notes whose marketability could be impacted by this bankruptcy filing.
[4] Not including all interest and fees. Some of the liens are asserted against the Railway Exchange Building and others against the garage.

#2365977v1      3

| | |
|---|---:|
| Cannon Design | $1,758,585.00 |
| Concrete Strategies | $155,000.00 |
| Geotechnology, Inc. | $45,066.13 |
| National Fire Suppression | $66,517.46 |
| Metropolitan Sewer District | $965.46 |
| TOTAL | $2,929,739.50 |

In this litigation, Gamma and the contractors are seeking to determine and resolve the relative priorities of the secured debts, so as to determine whether any of the claims of the contractors might prime the first lien positions of Gamma.

Tax credits are in essence governmental appropriations to be earned if the project is restored in compliance with the US National Park Service standards, inside certain timelines, requiring completion of the project. An initial qualification or an award of historic tax credits, or a tax exempt bond reservation that could lead to Low Income Housing Tax Credits, as the Railway Exchange Building is positioned for, still requires the actual physical restoration of the building. That is now stalled in Bankruptcy Court. In the present configuration, with various vacant buildings downtown and a low occupancy census for many other downtown St. Louis buildings, the secured claims exceed the value of the Railway Exchange Building and the vacant deteriorated (in need of demolition today) adjacent garage. As is well known in the industry, renovating and bringing back in service buildings the size and scope of the Railway Exchange Building is nothing short of a daunting task, requiring substantial tax credits and other subsidies as well as hundreds of millions of dollars of new funds, whether through capital contributions, investments or loans. Consequently, these projects involve exotic, time consuming, time sensitive and complicated financing structures and comprehensive plans. In this regard, HH Railway has been working closely with consultants well versed and connected in navigating the complex financial matrix here, working with the appropriate governmental authorities, meeting requisite deadlines and pursuing multiple options in terms of making these building productive.

#2365977v1                                               4

The tax credits are not guaranteed to remain in place during the course of the project. Many of the available credits are time sensitive and have specific target dates. For example, in order to preserve the MHTCs, HH Railway is required to spend approximately $20,300,000, which is ten percent of certain expenses, by July of 2020, which is only seven plus months away (RSMo section 253.559.8). To date, HH Railway had not met this spending threshold; and in a chapter 7 case, no trustee, especially one who would have to be an operating trustee, would have the funds or expertise to navigate and satisfy this complex spending requirement. If this spending requirement is not met, HH Railway would clearly be subject to the mandatory revocation by the Missouri Department of Economic Development of the MHTCs and there is doubt that new MHTCs could thereafter be obtained given the enactment of Missouri Senate Bill 590 in 2018. Even if a new application were granted, the MHTCs program has changed, making it more difficult to obtain them for the amounts previously granted, due to a new scoring system for MHTCs and the capping of allowable credits.[5]  The danger is the potential loss of over $50,000,000 of such credits and further delay.

As for the FHTCs now in effect, 100% of the credits would be available once the project is placed in service. Certain changes in ownership, through a sale, a foreclosure and perhaps a bankruptcy, would cause the loss of the FHTCs.  See 26 USC section 50(a). Once lost, the possibility of obtaining FHTCs in the future would be uncertain. Even if obtained, the applicable FHTCs program, which recently changed, now only permits one-fifth (1/5th) of the credits to be used each year, rather than 100% as under the present grant, which could result in a loss of about $10,000,000 from the present value of the current FHTCs. See PL 115-97, the Tax Cuts and Jobs Act, signed December 22, 2017, which went into effect January 1, 2018.

---

[5] Senate Bill 590, enacted by the 2018 Missouri legislative session, significantly reduced the amount of tax credits and changed the scoring system for obtaining credits to include a new job count matrix that will make it difficult for any new owner of the Railway Exchange Building to procure a new award of MHTCs.

#2365977v1                                                           5

If the time deadlines and spending requirements are not met and if the tax credits are lost, HH Railway will lose the benefit of no less than $100,000,000 of tax credits and will be in jeopardy of losing the other credits and governmental benefits identified above. Likewise, if the bankruptcy triggers a sale or foreclosure, a real possibility if an order for relief were granted, the tax exempt bonds and the LIHTCs would also be lost due to a change of ownership of the entities entitled to these subsidies. See 26 USC section 42(h).

The project does not generate any material revenues due to the vacancy of approximately 99% of the space. This is critical as the cost to maintain the Railway Exchange Building and the accompanying garage is significant, and requires payment of insurance costs, real property tax obligations and other monumental carry costs to simply maintain the project in its present state. This funding requires no less than $75,000 per month for these carrying costs alone, without any material significant improvements. No operating trustee has the resources to fund these expenses. There are few insignificant leases on the ground floor of the garage that do not generate significant monies, of which such lease revenues would also be part of Gamma's collateral base. Consequently, for all intents and purposes, there is no cash flow and there has never been any cash flow since HH Railway acquired these structures.

There are no material transfers of assets that would be avoidable, as there were never any material revenues. There is a pending complex lawsuit in the City of St. Louis Circuit Court over the water main break, which may take years to sort through. Any recovery could take years and the amount to be obtained is uncertain, as the case is being defended and disputed.

Recently, on or about November 7, 2019. the General Services Administration (the "GSA") published a request for proposal ("RFP"), indicating that the GSA is seeking approximately 143,000 square feet of space to lease in St. Louis. HH Railway believes the Railway Exchange Building would be an attractive location for this space; and, if successful in

procuring this lease, the leasing of this space would, along with the tax credits, importance, location and other advantages of the Railway Exchange Building, leverage many aspects of the project's development. HH Railway responded to this RFP, which response was due November 27, 2019.

In addition to the GSA RFP, HH Railway is actively attempting to sell, market and develop the project and has maintained lines of communication open with Gamma and others, keeping them informed of all developments. There are many different alternatives to the placing of the building in service. In the end, the property will ultimately be sold, whether voluntarily or involuntarily, or will be developed, with or without HH Railway. If the project is developed and successful and/or if there is a significant recovery in the pending suit regarding the water main rupture, then, in such a situation, there would be funds available to pay, as required by law, and in their order of priority, first, the secured creditors; second, the unsecured creditors; and, third, equity. The petitioning creditors, whose debt total approximately $115,500 in the aggregate represents a small fraction of the overall debt that likely exceeds $22,000,000.[6] No Bankruptcy Case or trustee can alter these hard facts nor make the case better for the petitioning creditors and other general creditors.

## STANDARD FOR ABSTENTION AND DISMISSAL

Pursuant to section 305 of the Bankruptcy Code, a Court "may dismiss a case under this title, or may suspend all proceedings in a case under this title if ….. the interests of creditors and the debtor would be better served by such dismissal or suspension". 11 U.S.C. 305(a). In determining whether abstention is appropriate, Courts review and evaluate various

---

[6] The primary petitioning creditor, Western States Fire Protection Company, which has about $65,000 of the initial $94,000 asserted to be owed, has a pending state court action against HH Railway, and, in fact, filed a summary judgment motion almost contemporaneously with the filing of the involuntary. Since the filing of the involuntary petition, a fourth creditor, HBS, Co. d/b/a/ Hudson Services ("HBS"), joined in the petition. Interestingly, HBS and HH Railway had negotiated a nominal settlement of the claim, but it was not consummated due to the filing of this case.

factors. While the factors are articulated somewhat differently by various Courts, they are, in essence, the same. In evaluating the best interests of the debtor and its creditors, Courts consider a) the availability of another forum to address the various issues, b) the financial costs and burdens of a bankruptcy case, including the economy and efficiency of case administration, c) whether the commencement of a bankruptcy case would duplicate other efforts pending elsewhere, d) whether bankruptcy court is essential to a just and equitable resolution, d) the support of the non-petitioning creditors, e) the level to which other pending proceedings have progressed in addressing the issues that would impact the cost and expense of starting anew in bankruptcy court; and f) the purpose or motivation of the petitioning creditors seeking bankruptcy jurisdiction. *See* In re NRG Energy, Inc., 294 B.R. 71 (Bank. Minn 2003); In re Wine and Spirits Specialties of Kansas City, 142 B.R. 345 (Bank W.D. Mo. 1992); and In re Iowa Trust, 132 B. R. 615 (Bank N.D. Iowa 1992). Of primary import would be identifying the pragmatic benefits of all constituencies and evaluating efficiency and economy of administration. *See* In Re NRG, 294 B.R. at 80; and In re Iowa Trust, 135 B.R. at 623.

As an alternative to abstention, there are grounds for dismissal of the case under section 707(a), which provides for dismissal of a case for cause. *Compare* In re Matthew N. Murray, 900 F.3d 53 (2nd Cir. 2018) which considered similar factors for abstention, such as specific and pragmatic fact inquiries and whether other proceedings provided protection of the interests of the creditors.

In reviewing all of the facts and circumstances in this case and applying the various factors listed above, there is a compelling case for abstention and dismissal.

## ARGUMENT IN SUPPORT OF ABSTENTION AND DISMISSAL

HH Railway is essentially a single asset case with limited or no revenue, much like the many cases which are not favored in bankruptcy court and are therefore dismissed. There is

good reason for this. A bankruptcy court can do very little with cases of this type. In the present context, HH Railway has a primary secured creditor with a debt in excess of $18,600,000. Competing with this secured creditor are various mechanics' lien claimants which are seeking to impose a priority of interest over Gamma, the secured creditor. These competing interests are already being litigated in state court, which has undisputed jurisdiction over this matter, having been pending since at least February of 2019.[7] These creditors, which have the overwhelming amount of debt, have substantially more skin in the game than the petitioning creditors, and they would be better served by having matters resolved or adjudicated where the case is pending. No bankruptcy court can alter the stubborn fact that this case is primarily one involving competing secured interests to determine which of the entities might be in the money and which are looking in from the outside. A bankruptcy case would only delay and stay the progress of these state court proceedings, which are better suited to address these issues. Compare In Re Powers, 35 B.R. 700, 703 (Bank. W.D. Mo. 1984) where the Court abstained not only due to pending state court proceedings, but also because there was nothing then to administer upon.

      The salvation, if any, of the modest unsecured creditor pool, is largely contingent on HH Railway or other entities stepping up to the plate, utilizing the federal and state tax credits, which would be seriously impaired by a bankruptcy proceeding. The bankruptcy case would only delay HH Railway's ability to meet the time sensitive spending deadlines imposed by the state tax credits, dooming the project, with the result that the millions of dollars of state tax credits would not be available for use. Likewise, if a trustee were appointed, the federal tax credits may be significantly impaired with the trustee being substituted for the debtor that was granted the credits. A trustee cannot sell the Railway Exchange Building or the garage at a section 363 sale

---

[7] It is uncertain whether the Bankruptcy Court would have jurisdiction over the various state court actions due to Stern related issues.    Stern v. Marshall, 564 U.S. 461 (2011)

#2365977v1                                              9

as the sale would constitute a triggering event that would result in the loss of the FTHCs, the bonds and the LIHTCs. A long prolonged bankruptcy, which this would be, would also cause serious harm to the MHTCs as it would be substantially more difficult to deal with the state and local authorities needed to maintain and to attract those willing to pay and invest fair value for the project.

The tax credits are complicated and difficult to apply even under less extreme circumstances. A bankruptcy case and the imposition of a trustee only makes the matters worse. One would be bringing into the project an operating chapter 7 trustee, unfamiliar with this complex transaction, who would have to get up to speed and have the appropriate knowledge to deal with these difficult and time sensitive issues, not an easy task. As this Court well knows, operating trustees are not favored, and, if appointed, are only allowed to operate for a limited period of time, which would not be the case here due to the many tasks needed to be accomplished over a long period of time. See section 721 of the Bankruptcy Code. Further, a conversion of the case to one under chapter 11 would likewise not be suitable, due to the lack of funds, the inability to fund the expense of administration and the difficulty, if not the impossibility, of confirming a plan.

At present, there is at least HH Railway working closely with its advisors, secured creditor and others in an effort to market and develop the project and preserve the use of the tax credits, which are essential to any potential success in the project. Without it, the group of unsecured creditors would have nothing. With the tax credits, there is at least a shot that there might be something for these creditors. Likewise, the potential for leasing space to the GSA would also be significantly impaired, due to the time constraints on addressing the proposal and also the negative and chilling impact that a bankruptcy could impose on this leasing process.

#2365977v1   10

As the Courts recognize, economy and costs of administration are paramount factors to consider. With non-productive income producing assets, there is no real funding source to administer a bankruptcy case. This leaves an operating trustee burdened by substantial ongoing expense, such as the costs of insurance, real property taxes and upkeep on vacant structures that cover more than an entire city block. Not only is there the significant and material cost of upkeep, but with the appointment of an operating trustee and the accompanying professionals, there are added layers of expense to administer a project, which cannot be afforded, especially when the basic costs cannot be paid. Again, just as in a single asset type case, there is simply no way to effectively pay for the costs and expenses, let alone find the time and expertise to advance this project along.

If the Court were to grant the order for relief, an operating chapter 7 trustee would therefore be confronted with the daunting task of satisfying the significant monthly carrying costs that continue to mount, the overwhelming potential liability of a huge downtown vacant building and garage occupying more than an entire city block, the tackling of maintenance and preservation of the various tax credits and subsidies and the spending needed to maintain them, and a lack of available funds, among a variety of other significant obstacles which would require substantial expertise to administer this case. This is not argument, but fact.

At present, the secured creditors are undersecured, with the existence of vacant buildings whose values are less than the total of the secured claims of the lender and lien claimants. To make this project a successful venture will require hundreds of millions of dollars in new investment, capital and loans, as the renovation of a structure with approximately 1,200,000 of square feet of space, with an adjacent obsolete and unusable garage, is nothing short of monumental. In a downtown with other vacant buildings, including the AT&T tower just blocks away, along with low occupancy rates with lower leasing values, it is a daunting task to put the

Railway Exchange Building back in service.  Market forces and the existing legal state remedies, whether judicial or non-judicial, are the only way these issues can be resolved. The additional overlay of a bankruptcy gloss just makes all of this worse by adding additional cost, delay, additional bureaucracy and a layer of additional personnel, such as a trustee and other professionals.  No one can guaranty the project will prevail, but the forcing of this matter into a bankruptcy case does not help.

The petitioning creditors' claims are a mere fraction of the approximate $23,000,000 of claims outstanding.  They should not be able to use as leverage the bankruptcy process as their collection tool, a factor courts consider in determining abstention, especially given the small amounts claimed and the negative impact on others.  The primary creditors in the case will likely help drive this project and will ensure that the creditors will be protected to the extent the economics work. In fact, HH Railway believes that the majority of creditors holding the overwhelming amount of debt support abstention, an important fact to be considered by the Court in making its determination. In Re NRG Energy, Inc., Id. At 81.  While HH Railway is sympathetic to the petitioning creditors' plight, the involuntary filing is simply not the appropriate remedy or forum for this case.  In the case of In re Matthew N. Murray, 900 F.3d 53 (2nd Cir. 2018), the Court, in dealing with what was essentially a single asset case involving a residential cooperative apartment building, recognized the limitations of what a bankruptcy court could accomplish and found that the state court forum was more appropriate, as the creditors were not prejudiced and had available state court remedies to the extent they existed.

Even if there existed alleged avoidable transfers, they would not override the need for abstention. In the present case, there could be no potential significant avoidable transfers, as there was never any material income generated on HH Railway's watch and therefore nothing material to transfer or divert, even if anyone would do such a thing. Other cases, such as In re

Wagner, 1988 WL 1571402 (Bank. S.D. Iowa 1988) and In re E.M.J., Inc., 1987 WL 857495 (Bank. N. Dakota 1987), recognize that potential avoidable transfers, even if they existed, which is not the case here, do not justify maintaining the case in bankruptcy court.

Bankruptcy is not a cure for all economic ailments. If only one could waive a magic wand and change the facts and economics of the situation, but the reality of this case and the need to let the remedies and market forces play out mandate that this Court abstain from exercising jurisdiction over this case. Consequently, under section 305 of the Bankruptcy Code, this Court should abstain and dismiss the case. Alternatively, as the Court did in In re Matthew N. Murray, id., the Court should dismiss the case under section 707 of the Bankruptcy Code.

                                    Respectfully Submitted,
                                    SUMMERS COMPTON WELLS LLC

Date: December 2, 2019       By: /s/ David A. Sosne
                                    David A. Sosne, #28365MO
                                    Brian J. LaFlamme, #49776MO
                                    Attorney for Trustee
                                    8909 Ladue Road
                                    St. Louis, MO 63124
                                    (314) 991-4999/(314) 991-2413 Fax
                                    dasattymo@summerscomptonwells.com
                                    blaflamme@summerscomptonwells.com

## **CERTIFICATE OF SERVICE**

      I certify that a true and correct copy of the foregoing document was filed electronically on December 2, 2019 with the United States Bankruptcy Court for the Eastern District of Missouri and has been served on the parties in interest via e-mail by the Court's CM/ECF System as listed on the Court's Electronic Mail Notice List. I further certify that a true and correct copy of the foregoing document has also been served by Regular United States Mail Service, first class, postage fully pre-paid, addressed to those parties listed below on December 2, 2019

| United States Department of Justice<br>U.S. Trustee's Office<br>111 S. 10th Street, Ste. 6353<br>St. Louis, MO 63102 | John Talbot Sant, Jr.<br>Affinity Law Group<br>1610 Des Peres Road<br>Suite 100<br>St. Louis, MO 63131 |
|---|---|

                                      /s/ Christina Hauck